# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH A. TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case number 4:14cv0556 TCM** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Kenneth Taylor (Plaintiff) for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Plaintiff applied for DIB and SSI in November 2010, alleging he was disabled as of April 1, 2008, because of plates in his legs, pins in his ankle, cracked vertebrae, and spinal problems. (R.[1] at 132-46, 219.) His applications were denied initially and in February 2013

---

[1] References to "R." are to the administrative record filed by the Acting Commissioner with her answer.

after a hearing held in August 2012 before Administrative Law Judge (ALJ) Kenneth G. Biskup. (Id. at 8-23, 28-76, 84-91.) After considering additional evidence, the Appeals Council denied Plaintiff's request for review, thereby effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-4)

### Testimony Before the ALJ

Plaintiff, appearing without representation, Jeffrey F. Magrowski, Ph.D., and Cheresse Lambers, Plaintiff's fiancé, all testified at the administrative hearing.

Plaintiff testified that he was then 46 years old, 6 feet tall, and weighed 190 pounds. (Id. at 36.) His weight in April 2008 was approximately 220 pounds. (Id.) He obtained his General Equivalency Degree (GED) in 1982. (Id.) He has graduated from truck driving school, but has never used the diploma. (Id. at 36-37.)

Plaintiff has primarily worked as a construction laborer. (Id. at 37.) He has done the work of a concrete finisher, bricklayer, carpenter, drywall hanger, painter, and landscaper. (Id.) He had tried working for a temporary service after April 2008. (Id. at 38-39.) After December 31, 2011, he had tried working as a restaurant cook but was fired because he could not keep up. (Id. at 41.) In April 2012, he had tried handing out samples for a ham store. (Id. at 42.)

He has a titanium plate in his right leg and pins in his right ankle. (Id. at 43.) These were placed in the 1990s as a result of a gunshot wound. (Id.) He was being treated by Dr. Boyd-Taylor, but has not seen her after April 2008 because his insurance ran out. (Id. at 44.) He owes her $75 for a co-pay and "just quit trying." (Id. at 45.) Asked if he had gone to any

of the health clinics that offer care that is free or at a reduced charge, Plaintiff explained that he cannot afford even the little co-pay the clinics require. (Id. at 44.) He had not tried any clinics, but had called one and found out its co-pay. (Id. at 44-45.) He never went to a clinic and asked if they would provide services for free or for a reduced charge. (Id. at 45.) Three or four days earlier, he received a Medicaid card. (Id.)

Asked about an x-ray of May 9, 2011, Plaintiff replied that he had not been x-rayed then. (Id. at 46-47.)

Plaintiff's back has started to hurt because of the problems with his right leg. (Id. at 48.)

Asked about the period after April 1, 2008, Plaintiff testified that he cannot carry anything and cannot lift anything heavier than ten pounds. (Id. at 48-49.) He does not go to the grocery store because he cannot walk farther than one block. (Id. at 49.) He cannot stand for longer than twenty to thirty minutes or sit for longer than "an hour or so" before having to lay down for a couple of hours. (Id. at 51.) He has difficulty using the stairs in his house down to the basement. (Id. at 53.) He does not take any pain medication. (Id. at 52.) He was taking ibuprofen but was told when recently hospitalized that it was aggravating his ulcers. (Id.)

His fiancé does all the cooking, cleaning, and laundry. (Id. at 54.) His daughters, one age seven and one age sixteen, live with them. (Id.)

Asked what he does on a typical day, Plaintiff replied that he watches television and reads books or magazines. (Id. at 54-55.) He does "[p]retty much nothing." (Id. at 54.) He

stopped driving a year ago because of problems with his leg. (Id. at 55-56.) His fiancé drives. (Id. at 56.)

Also, Plaintiff gets cramps in his arms and, approximately every other day, cannot raise them over his head. (Id. at 56-57.)

Ms. Lambers testified that Plaintiff had been treated for his ulcers between 2002 and 2004. (Id. at 60-61.) At the end of May, he was hospitalized at St. John's for high blood pressure. (Id. at 62.) He is now taking medication for it. (Id.) He stopped doing yard work in mid-2008. (Id. at 64.)

She further testified that she thinks Plaintiff does not go places because he is depressed. (Id. at 64.) She has suggested that he see someone about his depression. (Id. at 65.)

Dr. Magrowski testified as a vocational expert (VE). (Id. at 65-71.) He was asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and past work experience who is limited to light work with additional restrictions of only occasionally climbing stairs or ramps and never climbing ladders, ropes, or scaffolding. (Id. at 68.) This person needs to alternate between sitting and standing. (Id.) Asked if this person can perform any work, the VE replied that he cannot perform Plaintiff's past relevant work but can work as a parking lot attendant, contribution solicitor, and cashier. (Id. at 68-69.) These jobs exist in significant numbers in the state and national economies. (Id.)

If this hypothetical claimant can only perform work at the sedentary exertional level, there are jobs he can perform, including surveillance system monitor, order clerk in the food

and beverage industry, or some bench assembly work. (Id. at 69.) There is typically very little reaching overhead required in a sedentary job. (Id. at 70.)

If an individual needs to take an extra break at an unscheduled time or to lay down, he cannot maintain competitive employment. (Id.)

The VE further stated that his testimony was consistent with the *Dictionary of Occupational Titles* (DOT). (Id. at 70-71.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his applications, records from health care providers, and assessments of his physical and mental functional capacities.

When applying for DIB and SSI, Plaintiff completed a Disability Report, listing June 1, 2010, as the date when he stopped working because of his impairments. (Id. at 219.) He has completed the twelfth grade. (Id.) The interviewer noted that Plaintiff "walked with a noticeable limp." (Id. at 209.)

Plaintiff had reportable annual earnings for years from 1982 to 1986, inclusive, 1988 to 1996, inclusive, 1998 to 2008, inclusive, and 2010. (Id. at 149.) His highest earnings were $14,558,[2] in 1985. (Id.) In only three other years – 1986, 1999, and 2007 – did his earnings exceed $10,000 annually. (Id.) In only five of the remaining twenty-three years, did his earnings exceed $5,000 annually. (Id.)

_____

[2]All amounts are rounded to the nearest dollar.

The relevant medical records before the ALJ are summarized below in chronological order, beginning with the July 24, 2007, record of his office visit to Peggy Boyd-Taylor, D.O.,[3] for complains of back pain. (Id. at 255.) It was noted that he operated a jack hammer. (Id.) He was given a prescription for Vicodin. (Id.)

In August, Plaintiff completed a Pain Assessment form for Dr. Taylor, reporting that the pain was in his back, had not changed during the past thirty days, was an eight on a ten-point scale, with ten being the worst, was worse at 2:00 p.m., and was disabling, as compared to being a nuisance or distracting. (Id. at 254.) In October, using the same form, Plaintiff reported that his pain was in his back and legs, was a nine, was worse at 6:00 a.m. and 6:00 p.m., and was disabling. (Id. at 253.) His responses were the same when he completed the form again in December. (Id. at 252.) In January 2008, his responses were the same with the exception of his pain level being a ten. (Id. at 251.)

In April, Plaintiff saw Dr. Boyd-Taylor because he was concerned he had had a stroke. (Id. at 250, 256.) He had slurred speech and numbness in his right hand. (Id. at 256.) He was to have an electromyogram (EMG) of his upper extremities. (Id.) He was prescribed Vicodin for his pain, which he described as being an eight and disabling. (Id. at 250, 256.) His pain was worse at 6:00 a.m. and 6:00 p.m. (Id.)

Plaintiff's next treatment record is of his admission on May 2, 2012, to Mercy Hospital for complaints of abdominal pain, loose stools, fever, and chills for the past five days. (Id.

---

[3]In his supporting brief, Plaintiff identifies Dr. Boyd-Taylor as an "MD." The record reflects that she is a D.O., or doctor of osteopathic medicine.

at 281-302.) The pain was intermittent and increasing in frequency and severity. (Id. at 281.) He did not have shortness of breath, chest pain, or a cough. (Id.) His only current medication was ibuprofen. (Id.) He "denie[d] relevant medical history," but did have a history of orthopedic surgery to his right leg and an injury in 2009 to his left hand. (Id. at 282.) He reported having occasional arthritis pains and numbness in his hands, but denied having any anxiety or mood issues. (Id.) On examination, he was negative for, among other things, back pain, gait problems, behavioral problems, and decreased concentration. (Id. at 287-88.) He smoked half a pack of cigarettes a day and drank alcohol socially. (Id. at 282, 287.) A computed tomography (CT) scan revealed diffuse thickening of the wall of his colon, particularly on the right but appearing to also extend into his left colon, and "some slightly enlarged mesenteric lymph nodes in the right lower quadrant." (Id. at 285.) Chest x-rays were normal. (Id. at 294.) He was diagnosed with acute colitis, given antibiotics, and discharged with prescriptions for hydrocodone-acetaminophen, Norvasc (for high blood pressure), Flagyl (an antibiotic), and Cipro (an antibiotic). (Id. at 289, 291, 292.) On discharge, he was alert, cooperative, and in no distress. (Id. at 292.) It was recommended that he stop smoking. (Id. at 293.) He was to have a colonoscopy in approximately six weeks to rule out an atypical presentation of colorectal cancer or inflammatory bowel disease. (Id. at 289, 292.)

Also before the ALJ were assessments of Plaintiff's mental and physical residual functional capacities.

In May 2011, Plaintiff was examination by Elbert H. Cason, M.D., pursuant to his applications. (Id. at 263-67.) There was no evidence of any neurological, sensory motor, or reflex abnormalities. (Id. at 263.) There was no muscle atrophy or spasm, but there was tenderness in the muscles of the lateral aspect of the right thigh. (Id.) Plaintiff had a full range of motion in both knees and could heel and toe stand. (Id. at 266.) He had a reduced range of motion in his right ankle, but not in his left. (Id. at 267.) He had a slightly reduced range of motion on flexion and extension in his lumbar spine. (Id.) He had a full range of motion in his lumbar spine on lateral flexion to the right and to the left. (Id.) Straight leg raises were negative. (Id.) He had normal muscle strength in both extremities. (Id.) Dr. Cason diagnosed Plaintiff with (a) degenerative disc disease and tenderness of the lumbar paravertebral area with no spasm but with decreased motion and (b) decreased motion in his right ankle due to an injury. (Id. at 263.) He noted that Plaintiff walked with a limp but did not use an assistive device. (Id.) X-rays of Plaintiff's lumbar spine revealed grade 2 L5-S1 spondylolisthesis[4] with disc space narrowing and degenerative disc disease at L2-L3 and L3-L4.[5] (Id. at 265.)

---

[4]"[A] spondylolisthesis is a forward slip of one vertebrae . . . relative to another. . . . Spondylolisthesis can be described according to its degree of severity. One commonly used description grades spondylolisthesis, with grade 1 being least advance . . ." Mary Rodts, D.N.P., S p o n d y l o l i s t h e s i s :   B a c k   C o n d i t i o n   a n d   T r e a t m e n t , http://www.spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-back-condition-treatment (last visited Dec. 16, 2014). In grade 1 25 percent of the vertebral body has slipped forward; in grade 2 it is 50 percent. Id.

[5]The x-ray report is signed by Alan H. Morris, M.D. These are the x-rays that Plaintiff testified were not taken.

Later that month, a Physical Residual Functional Capacity Assessment (PRFCA) of Plaintiff was completed by Tracy Gamayo, a single decisionmaker.[6] (Id. at 77-83.) The primary diagnosis was grade 2 spondylolisthesis with disc space narrowing; a secondary diagnosis was degenerative disc disease of the lumbar spine. (Id. at 77.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; sit or stand for at least two hours during an eight-hour workday; and walk for approximately six hours in an eight-hour workday. (Id. at 78.) His ability to push and pull was otherwise unlimited. (Id.) He had no postural, manipulative, visual, or communicative limitations. (Id. at 79-80.) He had one environmental limitation -- the need to avoid all exposure to vibration. (Id. at 80-81.)

In October 2012, as directed by the ALJ, Plaintiff underwent an orthopedic evaluation by Dr. Morris.[7] (Id. at 305-18.) Plaintiff's chief complaints were of back pain and right foot, thigh, and knee pain. (Id. at 305.) He took Vicodin four times a day for the pain. (Id.) Plaintiff reported that he had injured his right foot in a fall from a roof twenty-two years earlier and then had a gunshot fracture to his right femur. (Id.) He has had two surgeries on the femur but no further treatment. (Id.) He has a decreased range of motion in his right knee and aching pain in his right thigh. (Id.) He has low back pain, and has had for twenty years.

---

[6]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

[7]See note 5, supra.

(Id.) The pain is constant and aggravated by cold weather, sitting for too long, and bending. (Id. at 306.) He can sit or stand for two hours and walk for thirty minutes. (Id.) When sitting he can lift fifty pounds; when standing he can lift twenty-five pounds. (Id.) His children frequently help him with putting on and taking off his shoes and socks. (Id.) He does not do any household chores, cooking, shopping, or driving. (Id.) Pain in his right leg wakens him from sleep approximately every two hours. (Id.) He has normal hand and finger control. (Id.) On examination, Plaintiff could walk fifty feet without a cane, but walked with an antalgic limp favoring the right leg. (Id.) He could not heel or toe walk because of pain and a limited range of motion in his right foot and ankle. (Id.) He lost his balance if he tried to do a tandem gait. (Id.) The range of motion in his lumbar spine was 60 degrees on flexion, 0 on extension, and 50 on right and left lateral bending. (Id. at 306, 318.) The range of motion in his right knee was 110 degrees on flexion and 0 on full extension. (Id. at 306, 317.) The range of motion in his left knee was 140 degrees on flexion and to 0 degrees on extension. (Id. at 306-07, 317.) The range of motion in his right ankle was "slightly restricted as compared to the left." (Id. at 307, 318.) He had a one centimeter atrophy of his right thigh (47 centimeters compared to 48 on the left) and a one centimeter atrophy of his right calf (36 centimeters compared to 37 on the left). (Id. at 307.) He could independently rise from a chair and get on and off the examining table. (Id. at 306.) Dr. Morris diagnosed Plaintiff with fracture right calcaneus with post-traumatic degenerative arthritis of the sub-talar joint and grade 2 spondylolitic spondylolisthesis of L5-S1 with degenerative disc disease of the lumbar spine. (Id.) X-rays of the lumbar spine had also revealed bullet fragments in

the soft tissue posterior to the level of the right sacroiliac joints.  (Id. at 310.)  Dr. Morris assessed Plaintiff as being able to frequently lift up to twenty pounds, occasionally lift up to fifty pounds, frequently carry up to ten pounds, and occasionally carry up to twenty pounds.  (Id. at 311.)  Plaintiff can stand or sit at one time for two hours or walk for thirty minutes.  (Id. at 312.)  During an eight-hour day, he can sit or stand for a total of three hours and walk for a total of two hours.  (Id.)  He does not require the use of a cane to ambulate.  (Id.)  He can frequently use either hand to reach, handle, finger, feel, push, or pull.  (Id. at 313.)  He can never use his right foot to operate controls, but can frequently use his left foot.  (Id.)  He can occasionally climb stairs and ramps, but can never balance, stoop, kneel, crouch, crawl, or climb ladders or scaffolds.  (Id. at 314.)  He can occasionally be exposed to unprotected heights and moving mechanical parts, but should never operate a motor vehicle.  (Id. at 315.)  He can engage in various activities, e.g., shop, travel, prepare a meal, but cannot walk a block at a reasonable pace on uneven or rough surfaces.  (Id. at 316.)

The next day, as also directed by the ALJ, Plaintiff had a psychological evaluation by Kimberly R. Buffkins, Psy.D., a licensed psychologist.  (Id. at 321-27.)  Plaintiff reported he was separated and "living between the homes of various family and friends."  (Id. at 321.)  He "report[ed] having problems with depression 'for some years,' but state[d] he has been feeling fine for the past month."  (Id.)  He was not seeing a psychiatrist or receiving any mental health counseling.  (Id.)  His current medications included Vicodin, blood pressure medication, and Vitamin D.  (Id. at 322.)  He had been married once and was separated for the past twenty years.  (Id.)  He started drinking alcohol at eleven or twelve years of age and

had engaged in weekly binge drinking. (Id.) Currently, he drank two to three beers once or twice a week. (Id.) He graduated from high school. (Id.) On examination, Plaintiff was cooperative and calm. (Id. at 323.) He walked with a limp and had good eye contact, a euthymic mood, appropriate affect, and coherent speech with normal rate and tone. (Id.) He was oriented in all spheres and had intact short-term memory. (Id.) He reported that he often read, watched sports, and spent time with his children, girlfriend, and mother. (Id.) His girlfriend drove him most places. (Id.) He got along fine with people. (Id.) His concentration, persistence, and pace were adequate. (Id.) Dr. Buffkins diagnosed Plaintiff with depressive disorder, not otherwise specified, in remission, and alcohol abuse, prior history, status uncertain. (Id. at 324.) His Global Assessment of Functioning (GAF) was 70 to 75.[8] (Id.)

On a Medical Source Statement of Ability to Do Work Related Activities (Mental), Dr. Buffkins assessed Plaintiff as not being limited by his mental impairments in his abilities to understand, remember, and carry out instructions; to interact appropriately with supervisors, co-workers, and the public; and to respond to changes in the routine work

[8]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th Ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34 (emphasis omitted). A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ." Id.

- 12 -

setting.  (Id. at 325-26.)  No other capabilities were affected by his mental impairments.  (Id. at 326.)  She concluded that, due to the uncertain history of alcohol abuse, he cannot manage his benefits in his own interests.  (Id. at 327.)

### The ALJ's Decision

The ALJ first found that Plaintiff had, contrary to his testimony, x-rays taken of his lumbosacral spine in May 2011.  (Id. at 11.)  He next found that Plaintiff met the insured status requirements of the Act through June 30, 2012, and has not engaged in substantial gainful activity since his alleged onset date of April 1, 2008.  (Id. at 14.)  And, Plaintiff has severe impairments of residuals of an old gunshot wound to the right distal femur with retained internal fixation; post-traumatic degenerative arthritis of right subtalar joint and right calcaneus; and grade 2 spondylolitic spondylolisthesis of L5-S1 with degenerative disc disease of the lumbosacral spine.  (Id.)  His depression is not severe.  (Id. at 15.)  Plaintiff does not have an impairment or combination of impairments that met or medically equaled one of listing-level severity.  (Id.)

The ALJ then concluded that Plaintiff has the residual functional capacity (RFC) to perform sedentary or light work with additional limitations of no climbing of ladders, ropes, or scaffolds; no kneeling or crawling; only occasionally climbing stairs and ramps; never driving a motor vehicle; and having to alternate sitting and standing.  (Id.)  The ALJ summarized Plaintiff's testimony, Ms. Lambers' testimony, the brief records of Dr. Boyd-Taylor, and the records from the Mercy Hospital admission.  (Id. at 15-18.)  He also summarized the examination reports of Drs. Cason, Morris, and Buffkins.  (Id. at 18-19.)  He

concluded that the descriptions of Plaintiff and Ms. Lambers of his disabling limitations were not credible. (Id. at 19.) The ALJ noted that Plaintiff had sought very little medical care, "despite the available free or nearly free medical care in the St. Louis metropolitan area," and took only ibuprofen for pain. (Id.) He found Plaintiff's allegation that he could not afford the co-pay to see a physician was not credible. (Id. at 20.) The ALJ further noted that Plaintiff was organized and direct during the hearing and had a sporadic work record. (Id.) The ALJ gave "much weight" to the opinion of Dr. Morris, finding it supported by the evidence as a whole and consistent with Dr. Morris' own findings. (Id.) Dr. Morris' conclusion that Plaintiff cannot balance, stoop, kneel, crouch, crawl, or walk at a reasonable pace on rough or uneven surfaces was not supported. (Id.) The ALJ also gave "[g]reat weight" to Dr. Buffkins' opinion. (Id.)

With his RFC, Plaintiff cannot perform any past relevant work. (Id. at 21.) With his age, education, and RFC, he can perform other work that exists in significant numbers in the national and state economies, as described by the VE. (Id. at 21-22.)

The ALJ concluded that Plaintiff is not disabled within the meaning of the Act. (Id. at 22.)

## Additional Records before the Appeals Council

Plaintiff submitted additional medical records to the Appeals Council in support of his request for review. Although the records came from Dr. Boyd-Taylor, there are no treatment notes from her. Instead, there are copies of other providers' records forwarded to her and her responses to a Physical Residual Functional Capacity Questionnaire.

The earliest record is the negative report of October 2012 chest x-rays taken to investigate Plaintiff's complaints of chest pain. (Id. at 339.) X-rays of his right femur revealed a healed fixated distal femoral fracture and status post gunshot wound. (Id. at 338.)

In March 2013, Plaintiff went to the emergency room for treatment of a scalp laceration resulting from hitting his head on a pipe in the basement when doing laundry and then losing consciousness. (Id. at 349-53, 362.) The staples placed then were removed eight days later. (Id. at 354-56, 358-60.) He smoked one-half pack of cigarettes a day and drank 42 cans of beer a week and a pint of whiskey a day. (Id. at 358-59.) His medications included Norvasc, Lioresal (a muscle relaxant), Librium (an anti-anxiety medication), hydrocodone-acetaminophen, Zestoretic (a diuretic), and Restoril (to treat insomnia). (Id. at 359.)

In April, Plaintiff consulted Mark Friedman, M.D., for multiple episodes of syncope. (Id. at 340-43.) Dr. Friedman noted that Plaintiff had been seen in the St. Mary's emergency room three weeks earlier for alcohol withdrawal and that Plaintiff reported he had stopped drinking two weeks earlier. (Id. at 340.) He further noted that Plaintiff had passed out the day after being treated in the emergency room for a laceration. (Id.) A workup had been normal. (Id.) Plaintiff had passed out twice since then. (Id.) Plaintiff was married and had three children. (Id. at 341.) Dr. Friedman found it difficult to ascertain the details about his passing out due to Plaintiff having been heavily drinking during the first two episodes. (Id. at 342.) Because a baseline electrocardiogram was abnormal, Dr. Friedman was concerned that Plaintiff might have arrhythmia, ordered an echocardiogram to evaluate Plaintiff for

structural heart disease, and placed a one-month event heart monitor on him. (Id.) He also encouraged Plaintiff to abstain from alcohol. (Id.) Plaintiff's hypertension was described as benign and adequately controlled; complaints of chest pain were resolved – a 2012 nuclear stress test was negative. (Id.) The event monitor revealed no symptomatic, patient-activated episodes. (Id. at 343.)

In June, Plaintiff consulted Devyani Mehta Hunt, M.D., for low back and right leg pain. (Id. at 346-48.) Plaintiff reported that his problems began ten years earlier when he sustained a gunshot wound to his right femur. (Id. at 346.) The discomfort he has had since was becoming worse. (Id.) Also, he had increasing pain in his low back; the pain was an eight or nine on a ten-point scale and was worse with walking and sitting. (Id.) The pain started in his back and radiated down his right leg past his knee. (Id.) He had numbness and tingling down to his toes. (Id.) And, he had neck pain. (Id.) Ibuprofen and Aleve did not provide much relief. (Id.) On examination, Plaintiff was alert, oriented, and in no acute distress. (Id. at 347.) He did not have any significant lower extremity swelling or lymphedema. (Id.) He had pain with full extension and flexion and a positive straight leg raising test. (Id.) He was tender at the L4 through S1 levels. (Id.) X-rays of his lumbar spine, cervical spine, and right femur revealed mild retrolisthesis of C3 on C4 and C4 on C5 with moderate to severe degenerative disc disease in the entire cervical spine, most significantly at C3-C4 through C6-C7. (Id.) He had grade 2 anterolisthesis of L5 on S1 and moderate to severe degenerative disc disease throughout the lumbar spine, with the most severe being at L2-L3 and L5-S1. (Id.) Dr. Hunt diagnosed Plaintiff with low back pain with

- 16 -

right L5 radicular pain in the setting of degenerative disc disease and grade 2 anterolisthesis of L5 on S1; right thigh pain with history of right femur fracture secondary to gunshot wound and open reduction with internal fixation, healed; and neck pain. (<u>Id.</u> at 347-48.) Plaintiff was to have a magnetic resonance imaging (MRI) of his lumbar spine and was prescribed Neurontin for his pain. (<u>Id.</u> at 348.) Following the MRI, Dr. Hunt diagnosed Plaintiff with grade 2 anterolisthesis of L5 on S1 with a left pars interarticularis defect; multilevel degenerative disc disease throughout the lumbar spine; and moderate to severe lumbar osteoarthritis. (<u>Id.</u> at 336-37.)

In July, Dr. Boyd-Taylor completed a Physical Residual Functional Capacity Questionnaire on Plaintiff's behalf. (<u>Id.</u> at 330-35.) She reported that she had been treating Plaintiff monthly since July 2007. (<u>Id.</u> at 330.) His impairments include chronic pain syndrome, moderate to severe degenerative joint disease, grade 2 spondylolitis spondylolisthesis, a bulging lumbar disc, atrophy in his right calf and thigh, severe osteoarthritis of his lumbar spine, gastroesophageal reflux disease (GERD), chronic cephalalgia (headaches), and depressive disorder. (<u>Id.</u> at 331.) His symptoms include constant pain in his lower back, an inability to sit or stand for long, persistent neck pain and dizziness, pain radiating to his arms and hands, and severe right thigh pain. (<u>Id.</u> at 330.) Plaintiff is not a malingerer. (<u>Id.</u>) His physical condition is affected by depression and anxiety. (<u>Id.</u>) She assessed Plaintiff as being incapable of performing even low stress jobs and reported that he will have to stand after sitting for two hours and sit after standing for thirty minutes. (<u>Id.</u> at 332.) He can sit for a total of approximately two hours in an eight-hour

day and stand or walk for less than that. (Id.) Every sixty minutes he needs to walk for five minutes. (Id. at 333.) He needs to take an unscheduled ten-minute break four times during the workday and needs to elevate his legs eight to ten inches every hour. (Id.) He can frequently lift and carry ten pounds, occasionally lift and carry twenty, and rarely lift and carry fifty pounds. (Id.) He can rarely twist, occasionally climb stairs, and never stoop, bend, crouch, squat, or climb ladders. (Id. at 334.) He does not have any significant limitations with reaching, handling, or fingering. (Id.) Because of his impairments, he will be absent from work more than four days a month. (Id.)

## Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. §§ 423(d)(1), 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting Cuthrell v. Astrue, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738. Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful

conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step

four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). <u>See also</u> 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting <u>Hiller v. S.S.A.</u>, 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting <u>Goff</u>

v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that (1) the adverse decision is against the weight of the evidence, including that before the Appeals Council, and (2) the ALJ erred (a) in determining his RFC and (b) addressing the issue of his failure to follow prescribed treatment without first finding him disabled.

The Record as a Whole.  "An application for disability benefits remains in effect only until the issuance of a 'hearing decision' on that application." **Myers v. Colvin**, 721 F.3d 521, 526 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.620(a), 416.330).  New evidence submitted to the Appeals Council is considered only to the extent it "relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b).  When that decision is challenged in a § 405(g) action, the Court determines whether the decision is "supported by substantial evidence on the record as a whole, including the new evidence." **Davidson v. Astrue**, 501 F.3d 987, 990 (8th Cir. 2007).  "'To be new, evidence must be more than merely cumulative of other evidence in the record.'" **Perks v. Astrue**, 687 F.3d 1086,

1093 (8th Cir. 2012) (quoting <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069 (8th Cir. 2000)).

And, although "[t]he Appeals Council's failure to consider [new, material] evidence may be

the basis for a remand," **<u>Whitney v. Astrue</u>**, 668 F.3d 1004, 1006 (8th Cir. 2012), the Appeals

Council "is not expressly required by the regulations to state its rationale for denying review,"

**<u>Riggins v. Apfel</u>**, 76 F.Supp.2d 707, 709 (W.D. Mo. 1999).

In the instant case, the Appeals Council stated that it had considered new evidence and

identified that evidence by source and dates. <u>Cf.</u> **<u>Lamp v. Astrue</u>**, 531 F.3d 629, 632-33 (8th

Cir. 2008) (remanding case in which it could not be discerned whether the Appeals Council

considered only one letter in a particular exhibit or two). The question then is whether after

considering the new evidence relating to the period before the ALJ's decision of February 21,

2013, there is substantial evidence on the record as a whole to support that decision. There

is.

When applying for DIB and SSI, Plaintiff cited plates in his legs, pins in his ankle,

cracked vertebrae, and spinal problems as his disabling conditions. Before the ALJ's decision,

he sought medical treatment in 2007 and 2008 for back and leg pain and in 2012 for

abdominal pain. He was diagnosed then with acute colitis. The records before the Appeals

Council are for treatment in March 2013 for a gash in his head, in April 2013 for episodes of

syncope, and in June 2013 for neck, low back, and right leg pain. Only these last records

relate to impairments – back and leg pain – that were at issue before the ALJ's adverse

decision. These records, however, are not persuasive for the same reasons cited by the ALJ

when discussing Plaintiff's back and leg pain. For instance, Dr. Hunt clearly relied on

Plaintiff's description of his pain and its limiting consequences; however, Plaintiff's descriptions were found not to be credible. See **Cline v. Colvin**, 771 F.3d 1098, 1104 (8th Cir. 2014) (finding it proper for the Commissioner to discount physician's opinion about claimant's RFC when conclusions were based on claimant's "discredited subjective complaints). Plaintiff complained to Dr. Hunt of disabling pain, but was taking only over-the-counter medications – a factor the ALJ considered as detracting from his credibility. See **Haynes v. Shalala**, 26 F.3d 812, 814 (8th Cir. 1994) ("A lack of strong pain medication is inconsistent with subjective complaints of disabling pain."); **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999) (finding that infrequent use of prescription medication supported conclusion that subjective complaints were not credible). Also, as did the record before the ALJ, the records submitted to the Appeals Council reflect a continuing failure by Plaintiff to seek medical treatment. This failure is inconsistent with disability.[9] **Shannon v. Chater**, 54 F.3d 484, 486 (8th Cir. 1995). See also **Spradling v. Chater**, 126 F.3d 1072, 1075 (8th Cir. 1997) (finding that claimant's failure to seek more aggressive treatment for complaints of disabling pain detracted from credibility).

Plaintiff contends that Dr. Boyd-Taylor's extensive list of diagnoses, see page 17, supra, support an inference her RFC opinion was based on her review of the record and requires a remand for the ALJ to properly weigh that opinion. "The ALJ has an 'independent duty to develop the record' and is required 'to seek additional clarifying statements from a

_____

[9]Plaintiff's argument that the ALJ erred when considering his failure to seek medical treatment is addressed below.

treating physician' when 'a crucial issue is undeveloped.'" **Cline**, 771 F.3d at 1105 (quoting

Goff, 421 F.3d at 791).  A crucial issue has not been undeveloped.  See **Martise v. Astrue**,

641 F.3d 909, 926-27 (8th Cir. 2011) ("[A] lack of medical evidence *to support a doctor's*

*opinion* does not equate to underdevelopment of the record as to a claimant's disability[.]")

The record includes two treatment notes from Dr. Boyd-Taylor – one before the alleged

disability onset date and one nine months later for a condition unrelated to those at issue.  The

record also includes six Pain Assessment forms completed by Plaintiff.  Four of these forms

are not accompanied by any treatment notes.  And, Dr. Boyd-Taylor's list of diagnoses include

conditions which are not supported by any record she allegedly reviewed.  For instance, Dr.

Boyd-Taylor listed a depressive disorder; there is no diagnosis of or treatment for such a

disorder.  Similarly, her inclusion of chronic cephalalgia and GERD on her list is unsupported

by the record.[10]  Moreover, a diagnosis in and of itself does not meet the criteria for listing-

level severity.  20 C.F.R. §§ 404.1525(d); 416.925(d).  See also **Lott v. Colvin**, 772 F.3d 546,

549 (8th Cir. 2014) ("[M]erely being diagnosed with a condition named in a listing and

meeting some of the criteria will not qualify a claimant for presumptive disability under the

listing.") (internal quotations omitted).

RFC.  Plaintiff next contends that the ALJ erred when assessing his RFC by improperly

rejecting some of Dr. Morris' opinions while accepting others.  Had the ALJ properly

---

[10]The Court notes that Plaintiff did seek medical care in May 2012 for abdominal pain.  The
pain was found to be caused by acute colitis.

considered those opinions, he would have concluded that Plaintiff cannot perform even sedentary work.

"Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." **Perks**, 687 F.3d at 1092 (internal quotations omitted).

As noted by Plaintiff, the ALJ incorporated in his RFC findings some of the limitations found by Dr. Morris after evaluating Plaintiff in October 2012, but not others. For instance, Dr. Morris found that Plaintiff cannot operate a motor vehicle. The ALJ included this limitation in his RFC. Dr. Morris found that Plaintiff should not balance, stoop, kneel, crouch, or crawl. The ALJ did not include these limitations in his RFC. Such inconsistent treatment, Plaintiff argues, fatally undermines the ALJ's RFC findings.

"[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." **Martise**, 641 F.3d at 927. (8th Cir. 2011) (internal quotations omitted) (second alteration in original). As noted above, when determining a claimant's RFC, the ALJ must first evaluate his credibility. **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005). The ALJ found Plaintiff not to be entirely credible, a finding Plaintiff does not challenge. This finding undermines the limitations Plaintiff argues should have been incorporated in his RFC. For instance, Dr. Morris observed Plaintiff walking with a limp and without a cane for fifty feet. His conclusion then that Plaintiff

cannot walk a block at a reasonable pace on uneven or rough surfaces is dependent on Plaintiff's subjective complaints. Plaintiff contends that Dr. Morris' findings that he cannot stoop, balance, kneel, or crawl are not dependent on his credibility, but are supported by objective evidence of atrophy in his right thigh and calf. The record reflects that Plaintiff was shot in that leg twenty-two years earlier, had no atrophy in May 2011, and in October 2012 had 2 percent atrophy in his right thigh and 2.7 percent atrophy in his right calf. These objective findings do not support his claim of error.

Failure to Follow Prescribed Treatment. In his final argument, citing Social Security Ruling 82-59, Plaintiff contends that the ALJ erred by considering his failure to follow prescribed treatment without first finding him disabled. The introduction to that Ruling reads: "Individuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work most follow the prescribed treatment to be found under a disability, unless there is justifiable cause for the failure to follow such treatment." Social Security Ruling 82-59, 1982 WL 31384, *1 (S.S.A. 1982) (emphasis added). Justifiable cause may include the inability to afford prescribed treatment the claimant is willing to accept, "for which free community resources are unavailable." Id. at *4.

In the instant case, however, the ALJ considered Plaintiff's failure to follow prescribed treatment or, indeed, to *obtain* any treatment or medication as relevant to the question of his credibility and the seriousness of his conditions. This is a proper consideration. See **Whitman v. Colvin**, 762 F.3d 701, 706 (8th Cir. 2014) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem.") (internal

quotations omitted) (finding ALJ had not erred by considering pro se claimant's "relative lack of medical care, including his failure to seek care from 'charity providers,' as relevant, considering [claimant's] allegations of 'unbearable back pain for the last two years'") (internal quotations omitted); **Goff**, 421 F.3d at 793 (finding claimant's failure to take pain medication relevant to issue of credibility when there was no evidence she was ever denied medical treatment due to financial reasons).

The only evidence of Plaintiff ever seeking low or no cost medical care is his testimony that he called a clinic and was told there would be a $25 co-pay, that he could not afford. He had not, however, contacted any other clinics or social service agencies seeking low or no cost medical care. And, when he did have Medicaid, he continued not to seek medical treatment until he went to an emergency room seven months later for an unrelated injury. See **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999) (rejecting claimant's challenge to ALJ's consideration that claimant had not taken any prescription pain medication for years; although claimant stated he could not afford such medication, there was no evidence he had sought treatment offered to indigents or chose to forego smoking cigarettes to finance medication).

For the forgoing reasons, Plaintiff's third argument is without merit.

## Conclusion

Considering all the evidence in the record, including the evidence before the Appeals Council, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or

because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Order of Dismissal shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  18th  day of December, 2014.